# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. 17 CR 149-1 |
| v. | ) | Judge Virginia M. Kendall |
| MARK McGILL, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2012, a federal jury convicted Defendant Mark McGill possessing and distributing child pornography. He has completed his prison sentence on those charges but remains under this Court's supervised release which contain a number of restrictions regarding his computer and cellphone use. *United States v. McGill*, 09 CR 770 (J. Gottschall)[1]. On February 3, 2017, during a home visit, McGill's probation officer seized a cellphone that he knew to be unmonitored by the probation office, provided the phone to the United States Attorneys' Office which then obtained a search warrant of the phone. Upon further analysis by the FBI, the prosecutor recovered pornographic images of children on the cellphone. On March 7, 2017, a federal grand jury indicted McGill on one count of possession of child pornography based on an image of child pornography found on the cellphone. McGill now moves to suppress the cellphone. [23]. Specifically, McGill disputes whether the phone was actually operable when it was seized arguing that if it was not operable, it was not in violation of the terms of his supervised release and was therefore improperly seized by the Probation Officer. Because the parties dispute material facts, a factual hearing is required to resolve the pending motion.

---

[1] Following an appeal, the Seventh Circuit reversed the conviction on the distribution count due to a jury instruction issue. *See* 09 CR 770, Dkt. 165.

1

# BACKGROUND

After an appeal vacating his original sentence, another district court sentenced McGill on one count of possession of child pornography to 65 months' imprisonment and 84 months' supervised release. *See* 09 CR 770, Dkt. 178; Dkt. 23 at 1. He began supervised release on November 21, 2014 and the supervision is scheduled to expire on November 20, 2021. (Dkt. 40 at 2.) Among the conditions of supervised release, McGill was required to "permit a probation officer to visit him … at any time at home or elsewhere and … permit confiscation of any contraband observed in plain view of the probation officer." (09 CR 770, Dkt. 178; Dkt. 23 at 1–2.) Conditions of release included that the Defendant shall not commit another federal, state, or local crime; Defendant shall permit a probation officer to visit him at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer. (Dkt. 23 at 1–2.) Special conditions included monitoring McGill's internet use:

> Defendant shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. The defendant shall consent to the installation of computer monitoring software on all identified computers to which defendant has access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application of information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The costs of the monitoring shall be paid by the defendant.

(Dkt. 40 at 3.) The sentencing court declined to impose a more stringent condition[2] that prohibited the possession of a computer or any other device with access to the internet without prior permission of the probation officer. (Dkt. 23 at 6.) The court also declined to impose the

---

[2] During the first sentencing this more stringent condition *was* imposed. 09 CR 770 at Dkt. 178.

condition recommended under 18 U.S.C. § 3583(d)(3) which authorizes a search of person, property, computer and other items with "reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct." (Dkt. 23 at 6.)

McGill also has a history of violating the conditions of his supervised release. On February 23, 2015, Probation Officer Hence Williams ("H.W.") discovered that McGill had an unmonitored cellphone with internet access. (Dkt. 40 at 4.) The Probation Officer instructed McGill to discard the phone as soon as possible and showed the defendant phones that he could purchase without internet access. *Id.* Subsequently, during a weekly review under the Computer and Internet Monitoring condition, the Probation Office saw that McGill had viewed sexually stimulating videos and images of minors on the monitored cellphone. *Id.* McGill admitted that he violated the terms of his supervised release and agreed to an additional condition of supervised release, which prohibited him from possessing or having under his control any pornographic, sexually oriented, or sexually stimulating materials. (9 CR 770) (Dkt. 199) (J. Gotschall). Next, on June 17, 2016, McGill failed a polygraph because deception was detected when he answered "no" to the question of whether he had sexual contact with a minor. (Dkt. 40 at 5.)

On February 3, 2017, the Probation Officer visited McGill. (Dkt. 38-1, McGill Affidavit at ¶ 5.) The visit was unscheduled but McGill was expecting a visit around that date. (*Id.*) H.W. walked through McGill's home and he observed two cellphones in the bedroom. (*Id.* at ¶¶ 6, 27; Dkt. 40 at 5.[3]) The Probation Officer recognized a black cellphone that was subject to monitoring, but asked McGill about another white cellphone. (Dkt. 40 at 5–6.) McGill told him that it was his old cellphone that no longer worked. (Dkt. 38-1 at ¶ 8.) He further explained that

---

[3] The facts in the government's brief cite to the H.W.'s report and the government's interview of H.W., materials that have been produced to McGill. (Dkt. 40 at 5.)

he only used the phone to charge the battery to the black monitored phone. (*Id.* at ¶ 8.) McGill showed the PO that the battery that had been charging in the white phone also fit the black phone. (*Id.*) Then, at the PO's request, McGill put the battery back into the white phone and handed it to H.W. (*Id.* at ¶ 8.)

The parties dispute what occurred next. According to McGill, when the Probation Officer tried to turn on the white phone, he was unable to do so, confirming what he had represented to H.W. about the phone being broken. (Dkt. 38-1 at ¶ 10.) But according to the PO, when he asked McGill about the contents of the white phone, McGill was distressed and told the PO. that "[t]here are things on that phone that will send me back to prison." (Dkt. 40 at 6.) The Probation Officer also reported that McGill stated "I just can't control myself with these devices." *Id.* Next, the PO turned on the cellphone and placed it in airplane mode, during which he observed a young boy's face as the background wallpaper of the phone. (Dkt. 40 at 7.) McGill admits that when the PO asked if he was going to find anything on the phone that McGill responded he would. (Dkt. 38-1 at ¶ 12.) McGill denies, however, that he made the other statements the PO alleges that he made and specifically denies admitting that there was child pornography on the phone. (*Id.*)

After seizing the phone, the Probation Officer turned it over to the FBI. (Dkt. 23 at 2.) A subsequent search of the white cellphone revealed images of child pornography. (*Id.* at 2.) There is no information in the record about whether the phone was operational upon its arrival at the FBI or if the FBI determined the last time the phone had been accessed prior to the FBI's custody of it. As a result of the seizure, on March 7, 2017, a federal grand jury returned a one-count indictment charging McGill with possessing a device which contained an image of child pornography. (*Id.* at 2–3.)

On March 29, 2017, McGill's counsel filed a motion for disclosure of manuals or directives governing the administration and implementation of Probation's "Computer and Internet Monitoring Program" in order to determine whether such directives spoke to the propriety of the seizure. (Dkt. 23 at 3.) The government and Probation opposed the motion and further stated that there were no special manuals or directives and therefore the motion was denied as moot on that basis. (*Id.* at 3.)

## LEGAL STANDARD

Fourth Amendment claims present two distinct questions: (1) whether a search or seizure actually occurred; and (2) if so, whether the search or seizure was unreasonable. *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010). In *Knights*, the Supreme Court examined the reasonableness of a search for investigative purposes of a probationer by a law enforcement officer. *Id.* at 115–16. "[T]he reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 118–19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). The government has a considerable interest in supervising probationers. *See id.* at 120 ((("[T]he very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law.") (citations and internal quotations omitted)). Unlike the ordinary criminal, "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence" because they are aware that at a probation revocation hearing, proof beyond a reasonable doubt and the right to a jury trial do not apply. *Id.* (citations omitted). "[T]he balance of these considerations require[d] no more than reasonable suspicion to conduct a search of th[e] probationer's house." *Id.* at 121. Reasonable suspicion consists of "a sufficiently

high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Id.* at 592 (citation omitted).

When presented with a motion to suppress, district courts are required to conduct evidentiary hearings when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion. *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) (citing *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007)). In order to be granted an evidentiary hearing, the defendant's allegations and moving papers must be "sufficiently definite, specific, non-conjectural and detailed." *Id*. The defendant bears the burden of both identifying a definite disputed factual issue and demonstrating its materiality. *Id*. McGill must articulate in what manner the ultimate determination would be different if his version of the facts were accepted. *See McGaughy*, 485 F.3d at 969.

## DISCUSSION

McGill argues that the Probation Officer violated his Fourth Amendment rights by seizing the white cellphone and turning it over to the Prosecutor because the information known to the PO at the time of the seizure did not support the reasonable suspicion that McGill was in violation of conditions of his supervised release. At a minimum, McGill requests the Court hold a hearing based on the factual disputes surrounding whether the phone was operable. The government argues suppression is improper based on any one of four theories: (1) the PO reasonably seized the phone as contraband in plain view; (2) the seizure of the phone was based on reasonable suspicion; (3) law enforcement's search of the phone was inevitable; and, (4) the PO acted in good faith. Because there are underlying disputed facts to resolve to these issues, the Court requires an evidentiary hearing.

A. <u>Contraband in Plain View</u>

The government first argues that the white cellphone was contraband in plain view regardless of the dispute as to whether the phone turned on. The plain view doctrine permits seizure of items if: (1) law enforcement is lawfully present; (2) when the item is seen, the item is in plain view; and (3) the incriminating nature of the seized item is immediately apparent to the law enforcement officer. *United States v. Raney*, 342 F.3d 551, 558–59 (7th Cir. 2003). It is undisputed that the PO was lawfully present and that the cellphone was in plain view. (Dkt. 42 at 2–3.) The question, then, is whether the incriminating nature of the cellphone was immediately apparent. For the incriminating nature of the seized item to be immediately apparent, the officer "must have probable cause to believe that the item is contraband or otherwise linked to criminal activity." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004). There are two issues that impact the plain view analysis. First, the parties dispute the proper interpretation of McGill's conditions on supervised release and specifically, whether an additional and unmonitored phone, in it of itself, was obvious contraband in plain view. And, second, whether the additional disputed facts surrounding the seizure are material to the contraband determination.

First, the parties dispute whether the presence of the unmonitored cellphone in it of itself made the cellphone immediately incriminating. The government argues that the violation was obvious because an explicit condition of McGill's supervised release was that he "shall permit a probation officer to visit him at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer." (Dkt. 40 at 10.) While the condition clearly gives an officer the right to confiscate contraband, it does not resolve whether an unmonitored phone automatically constitutes contraband. McGill points out that his conditions of supervised release did not broadly prohibit the possession electronic devices

7

capable of connecting with the internet. (Dkt. 42 at 3.) Such a prohibition was initially a term of his supervised release, but when McGill was resentenced, Judge Gotschall removed the condition. (*Id*. at 3.) In its place, the court imposed the condition that McGill must comply with the requirements of the Computer and Internet Monitoring Program and "shall consent to the installation of computer monitoring software on all identified computers to which defendant has access." (*Id*.). The court could have imposed a condition that a defendant must consent to "monitoring software on *all* computers to which defendant has access," but that the language restricts monitoring to "identified computers to which defendant has access." (*Id*.) Based on the language of the condition, then, McGill argues that the white cellphone was not contraband because it was not an identified phone subject to monitoring but merely a broken phone used as a charger. The presence of the cellphone on its own, therefore, is not necessarily contraband under the conditions of McGill's release. The government relies on *United States v. Key* for the proposition that a cellphone's incriminating nature can be immediately apparent in some circumstances. 162 F.Supp.3d 674 (N.D. Ill. 2016). But in *Keys*, there had already been a suppression hearing and the Court relied on testimony by the officer that linked a phone seized from a pimp's motel room to the alleged crime of prostitution. The Court only reached the conclusion that the incriminating nature of the phone was immediately apparent after the officer tied the facts together.

Given that a cellphone is not in it of itself contraband and the conditions do not explicitly address this situation, then we must turn to the circumstances surrounding the seizure. According to the Probation Officer, the incriminating nature of the cellphone was obvious: the PO knew that the cellphone was unmonitored, he was able to turn on the cellphone and found that the wallpaper of the phone was the image of a young boy, and McGill confessed to the PO that the phone had pornography and that he could not control himself around such devices. According to McGill, the

PO did not have reason to believe the cell phone was contraband: McGill filed an affidavit stating that he had two cellphones, that only one of the cellphones was monitored, that McGill told the PO that the unmonitored cellphone did not work, and that the phone did not turn on when the PO tried to power it up, thus corroborating McGill's statement that the phone did not work. (Dkt. 42 at 5.). The contradiction in McGill and the PO's version of events demonstrates that there is a factual dispute the impacts the analysis of whether the cellphone was contraband. *Cf., McGaughy*, 485 F.3d at 969 (a suppression hearing was not required when the defendant did not allege a definite dispute and defendant's materiality argument was solely supported by bald assertions of bias.) Therefore, the Court will not deny the Motion based on the plain view doctrine.

B. Reasonable Suspicion

The government next argues that even if the Court were to find that the unmonitored cellphone was not contraband in plain view, the seizure was reasonable in light of McGill's supervised release and because he is subject to the Computer and Internet Monitoring Program. (Dkt. 40 at 13.) The parties agree that probationers have a diminished expectation of privacy and that reasonable suspicion is the proper standard to apply to the seizure of an item in a probationer's possession. (Dkt. 23 at 4; Dkt. 40 at 13.) Therefore, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's privacy is reasonable." *United States v. Knights*, 534 U.S. 112, 114 (2001). "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *Knox v. Smith*, 342 F.3d 651, 659 (7th Cir. 2003).

The government argues that the undisputed facts gave rise to the Probation Officer's reasonable suspicion that McGill was using the cellphone to access child pornography and that the cellphone was contraband because it was unmonitored. According to the government, the undisputed facts include: (1) McGill was previously convicted of possession of child pornography; (2) McGill had previously violated his supervised release; (3) McGill failed two polygraphs by answering "no" to the question of whether he has had any sexual contact with a minor; 4) McGill was subject to an internet monitoring condition and was prohibited from possessing sexually stimulating material; and 5) the PO. discovered an undisclosed, unmonitored phone in McGill's home. (Dkt. 40 at 17.).

Regarding the prohibition from possessing sexually stimulating material, it is not clear whether McGill possessed sexually stimulating material if, accepting McGill's version of events, McGill only possessed an inoperable phone. There is no timeline of when the white cellphone was operational and so it is conceivable that the phone never worked while McGill was on supervised release. If that were the case, McGill may have possessed a physical phone while on supervised release, but he never had access to the phone's contents. As defense counsel points out, old, unused electronics are commonplace in a 2017 home, (Dkt. 23 at 7), and there is no condition that McGill should have turned over an inoperable phone. Factual questions regarding the analysis of the phone are necessary to resolve some of the issues regarding the operability of the phone.

The government primarily relies on two cases to demonstrate that the circumstances here warranted reasonable suspicion for the seizure and search of the white cellphone. However, in both cases, the undisputed facts clearly supported the constitutionality of those seizures. *See United States v. Yuknavich*, 419 F.3d 1302 (11th Cir. 2005); *see also United States v. Makeeff*,

820 F.3d 995 (8th Cir. 2016). The defendants in *Yuknavich* and *Makeeff* confessed to their probation officers that they had recently viewed child pornography on the seized devices. *See Yuknavich*, 419 F.3d at 1306; *see also Makeeff*, 820 F.3d at 998. In neither case was there a dispute as to the operability of the devices. *Yuknavich* is further distinguishable in that the defendant signed a consent form that permitted the officers to take the additional computers to be analyzed by the county police; there are no similar indications of consent to the seizure here. *Id.* at 1307. There was also no dispute that Yuknavich made his probation officer wait ten minutes at his door and was obviously nervous when he opened the door. *Id.* at 1306. Here, there was no delay and the parties dispute whether McGill acted nervously. *Makeeff* is also additionally distinguishable because the probation officer had received a tip that Makeeff had bragged about using a computer and possessing child pornography while on supervision. *Makeeff*, 820 F.3d at 998. Here, the PO had no similar independent information that McGill was currently violating the conditions of his release. In summary, the government's version of undisputed facts and legal support are insufficient to determine whether the PO had reasonable suspicion to seize the cellphone without a hearing on the facts.

    C. Inevitable Discovery

Under the doctrine of inevitable discovery, illegally obtained evidence will not be excluded if the government proves by a preponderance of the evidence "that the officers 'ultimately or inevitably would have … discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). To satisfy its burden, the government must show: (1) "that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence;" and (2) "that it would have conducted a lawful search absent the

challenged conduct." *See id.* (citing *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) ("[W]hat makes a discovery 'inevitable' is not probable cause alone ... but probable cause plus a chain of events that would have led to a warrant ... independent of the search.")). The government "is not required to show that investigators in fact obtained or sought a warrant in order to prove that they inevitably would have done so." *Marrocco*, 578 F.3d at 640 n.21. Instead, the government only needs to show that "[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant." *Id*. at 640; *see also United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) (holding that police inevitably would have sought a warrant to search defendant's hotel room because "it would have been foolish not to want to look for the gun there").

The government argues that the evidence here is sufficient to invoke the inevitable discovery doctrine. (Dkt. 40 at 20.) First, the government argues that the information and evidence gathered by H.W. provided evidence to apply for a search warrant for the cellphone. (Dkt. 40 at 20.) Further, the government argues that the fact that Probation applied for and was issued a search warrant supports that it would have seized the cellphone lawfully absent the challenged conduct. *Id.* The government also argues that it would be unreasonable to assume that H.W. would allow the cellphone to remain in McGill's possession without requesting a warrant.

But the strength of the government's inevitability argument depends, at least in part, on whether the phone powered on. If the phone was inoperable, it is not inevitable that H.W. would have obtained a warrant. McGill points out that this is especially true in light of his history on supervised release. On February 23, 2015, the Probation Office discovered that McGill had an internet capable cellphone in his possession which was not monitored. (Dkt. 42 at 9.) McGill

12

explained to the officer that the phone was given to him by his father when he was released from custody. *Id.* McGill was advised to get rid of the phone as soon as possible and to purchase a phone without internet capabilities. *Id.* Here, then, it is possible H.W. would have similarly advise McGill to get rid of the phone as soon as possible rather than obtain a warrant. Another material dispute exists as to whether McGill actually confessed to the contents of the phone; had he confessed, it is more reasonable to presume that discovery was inevitable. *See, e.g., United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012) ("unreasonable to think that, after [Defendant] admitted to two FBI agents that he had pornography, the FBI would have failed to follow up and obtain a search warrant. That fact alone is enough for the inevitable discovery doctrine to apply.") For those reasons, the doctrine of inevitable discovery does not support denial of McGill's Motion.

    D. Good Faith

The government's final argument against suppression is that the PO acted in good faith. Specifically, he took a reasonable approach by seizing the cellphone and immediately calling the FBI to obtain a search warrant. The exclusionary rule applies only when benefits of deterring future Fourth Amendment violations outweighs the heavy costs of suppressing evidence. *Herring v. United States*, 555 U.S. 135, 140 (2009). When law enforcement officers act with objectively reasonable good faith belief that their conduct is lawful, deterrence is unnecessary and the exclusionary rule does not apply. *Davis v. United States*, 131 S.Ct. 2419, 2423–24 (2011). At a hearing, the Court can listen to the testimony and judge the credibility of the two versions of what occurred when the cellphone was seized and can better resolve the issues set forth.

## **CONCLUSION**

Because there are disputes regarding material facts surrounding the seizure of Mark McGill's cellphone, the Motion to Suppress is taken under advisement and the Court will hold a hearing on the issues.

_____
Hon, Virginia M. Kendall
United States District Judge

Date: November 7, 2017