**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 CR 149 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| MARK McGILL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On March 7, 2017, Defendant Mark McGill was charged with possession of child pornography pursuant to 18 U.S.C. § 2256(8)(A) while on mandatory supervised release for a previous conviction for distributing child pornography. (Dkt. No. 1.) McGill moved to suppress a cellphone and all images subsequently discovered on the phone seized by his probation officer during a regular home visit. (Dkt. No. 23.) On November 20, 2017, the Court held an evidentiary hearing to resolve factual disputes central to the outcome of McGill's motion. For the following reasons, McGill's Motion to Suppress [23] is denied.

## BACKGROUND

In 2012, a federal jury in Judge Gottschall's court convicted McGill of possessing and distributing child pornography. *See* 09 CR 70, Dkt. No. 121. Judge Gottschall sentenced McGill to a term of 108 months in prison and 20 years of mandatory supervised release on both counts to run concurrently. *See id.* at Dkt. No. 147. On appeal, the Seventh Circuit reversed the conviction on the distribution count due to a jury trial error. *See id.* at Dkt. No. 165; *United States v. McGill*, 754 F.3d 452, 460 (7th Cir. 2014). On November 21, 2014, Judge Gottschall

1

resentenced McGill to 65 months in prison and 84 months of supervised release on the possession count. *See* 09 CR 770, Dkt. No. 178.

## I.     Conditions of Supervised Release

Among his conditions of supervised release, McGill was required to "not commit another federal, state, or local crime" and to "permit a probation officer to visit him . . . at any time at home or elsewhere and [to] permit confiscation of any contraband observed in plain view of the probation officer." *Id.* The special conditions of supervision also required with regard to McGill's internet usage that:

> Defendant shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. The defendant *shall consent to the installation of computer monitoring software on all identified computers to which defendant has access.* The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application of information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The costs of the monitoring shall be paid by the defendant.

*Id.* (emphasis added).

Judge Gottschall declined to impose the following restriction—a restriction she had imposed in McGill's original sentence:

> The defendant shall not possess or use a computer, camera or any device with access to any "online computer service" at any location (including place of employment) without the prior approval of the probation officer. . . . The defendant shall not possess camera phones or electronic devices that could be used for covert photography without the prior approval of the probation officer.

*Id.* at 147. The court also declined to impose a restriction requiring McGill to submit his "computer, other electronic communications or data storage devices or media . . . to search at any time . . . by any . . . probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct," as permitted under 18 U.S.C. § 3853(d)(3).

## II. Past Violations of Supervised Release

McGill has a history of violating the terms of his supervised release including by viewing child pornography on his monitored cellphone and by failing polygraph tests during which he was asked whether he was viewing child pornography. (Dkt. No. 4-5.)

In October 2015, while on supervised release for the first conviction, during a weekly review of McGill's identified cellphone pursuant to the Computer and Internet Monitoring condition of his supervised release, McGill's Probation Officer at the time, Jay Nichols, discovered that McGill had viewed sexually stimulating videos and images of minors on his monitored cellphone.  (Dkt. No. 40 at 4.)  McGill admitted to the violation before Judge Gottschall and on October 20, 2015 Officer Nichols filed a Request to Modify the Conditions of Release or Term of Supervision with Consent of Offender seeking to add a condition of supervised release prohibiting McGill from "possess[ing] or hav[ing] under his control any pornographic, sexually oriented, or sexually stimulating materials, including visual, auditory, telephonic, or electronic media, computer program, or services."  (*Id*.; 09 CR 770, Dkt. No. 198.) On October 21, 2015, Judge Gottschall granted the agreed request and imposed the additional condition of supervised release.  09 CR 770, Dkt. No. 199.

On or about June 17, 2016, McGill failed a polygraph test administered as part of his sex offender treatment program.  The test detected deception when McGill answered "no" to the questions regarding his compliance with the conditions of his supervised release.  (Dkt. No. 40 at 5.)  On September 29, 2016, McGill failed a polygraph test a second time for the same reason. (*Id.*)  When asked about the test results, McGill maintained that he gave honest answers on both occasions.  (*Id.*)

### III.    February 3, 2017 Home Visit

On February 3, 2017, Probation Officer Hence Williams conducted a home visit at McGill's residence during which he discovered and seized an unmonitored cellphone in McGill's possession.  (Dkt. No. 38-1.)

The home visit was unannounced but McGill was expecting a visit around that date. (Dkt. No. 36-1 at ¶5.)  When Officer Williams arrived, McGill let him in.  Officer Williams walked through the home and observed two cellphones in McGill's bedroom: a black cellphone he recognized as McGill's monitored phone and a second, white cellphone charging by the bed. (Dkt. No. 36-1 at ¶¶ 6-7; Dkt. No. 40 at 5-6.)  Officer Williams asked McGill about the white cellphone and McGill told him it was an old cellphone that no longer worked and that he used it only to charge a spare battery for the black monitored phone.  (Dkt. No. 36-1 at ¶ 8; Dkt. No. 40 at 6.)  McGill removed the battery to show Officer Williams that it also fit in the back phone. (Dkt. No. 36-1 at ¶ 8; Dkt. No. 40 at 6.)  At Officer Williams' request, McGill put the battery back into the white phone and handed it to him.  (Dkt. No. 36-1 at ¶ 9; Dkt. No. 40 at 6.)

In their pre-hearing motions, the parties disputed what occurred next.  According to an affidavit McGill submitted, Officer Williams tried to turn the phone on but was unable to do so and then told McGill that he was taking the phone.  (Dkt. No. 36-1 at ¶¶ 10-11.)  Officer Williams then asked McGill if he was going to find anything on the phone and McGill responded that he would but never said anything about child pornography being on the phone.  (*Id.* at ¶ 12.)

According to the government, McGill became visibly distraught after handing over the phone.  (Dkt. No. 40 at 6; 09 CR 770, Dkt. No. 213 at 171.)  Officer Williams inquired as to the cause of his distress and McGill responded, "There are things on that phone that will send me back to prison.  I just can't control myself with these devices."  (*Id.*)  Officer Williams asked if

there was child pornography on the phone and McGill responded that there was. (*Id.*) McGill did not provide details of the images on the phone but when Officer Williams asked about the two recently failed polygraphs, McGill stated that there was "some really bad stuff on there," that he "will be going back to prison" and that he did not see any way he could possibly not go back to prison considering the images on the cell phone. (*Id.*) Officer Williams then powered on the cellphone, placed it in airplane mode, turned it off and removed the battery. (Dkt. No. 40 at 6-7; 09 CR 770, Dkt. No. 213 at 171-172.). While the phone was powered on, Officer Williams observed a young boy's face as the background wallpaper of the cellphone. (Dkt. No. 40 at 7.)

Officer Williams turned the phone over to the FBI and the FBI applied for and obtained a search warrant. (*Id.*). The subsequent search of the phone revealed thousands of images of child pornography. (*Id.*) On March 7, 2017, a federal grand jury returned a one-count indictment charging McGill with possessing a device containing images of child pornography based on the images found on the seized phone. (Dkt. No. 1.)

## IV. McGill's Motion to Suppress

On May 12, 2017, McGill filed a motion to suppress the phone and all evidence obtained from the search of the phone. (Dkt. No. 22 at 3.) McGill argued that the seizure of his phone was unlawful because the information known to Officer Williams at the time of the seizure did not support a reasonable suspicion that McGill was in violation of the conditions of his supervised release or otherwise engaging in criminal activity. Specifically, McGill argued that the phone did not work—as corroborated by the fact that Officer Williams allegedly was unable to power it on—and the conditions of his supervised release did not prohibit the possession of old, non-functioning, broken or inactivated electronics. McGill also argued that he did not say

anything to Officer Williams about there being child pornography on the phone and that Officer Williams had no other basis for reasonable suspicion that McGill was committing a violation or crime.

The government disputed that the phone was inoperable and that McGill did not confess to having child pornography on the phone. The government argued suppression is improper based on any one of four theories: (1) the probation officer reasonably seized the phone as contraband in plain view; (2) the seizure of the unmonitored phone was based on reasonable suspicion; (3) law enforcement's search of the cellphone and discovery of the evidence contained within it was inevitable; and (4) the probation officer acted in good faith. (*See* Dkt. No. 40)

Based on the filings, the Court determined that a hearing was necessary to resolve the many disputed factual issues. On November 20, 2017, the Court held an evidentiary hearing to resolve these factual issues.

## V.     Evidentiary Hearing

At the suppression hearing, the government presented the testimony of Probation Officer Williams and forensic examiner Fabiola Mejia. McGill chose not to testify, instead relying on the affidavit previously filed with his Motion to Suppress.

Officer Williams testified that he worked as a probation officer for 12 years, five of which he specialized in supervising sex offenders. (Tr. at 10.) He estimated that he supervised approximately 100 sex offenders during that time. (*Id*.) Officer Williams testified also that as part of his continuing education he attended training specifically designed to train him to manage sex offenders including a program on the use and capabilities of digital media devices in order to better enforce court-imposed restrictions on computer and internet usage. (Tr. at 11-12.)

Officer Williams supervised McGill for approximately eight or nine months beginning in May 2016, at which point he familiarized himself with McGill's presentence report, underlying conviction, judgment, and conditions of supervised release. (Tr. at 13-15.) Officer Williams also read the previous Probation Officer's case notes and spoke to his previous Probation Officer Nichols. (Tr. at 14, 16.) Based on this review, Officer Williams learned that in February 25, 2015, Officer Nichols discovered that McGill had access to an unmonitored cellphone with internet access, instructed McGill to discard the phone and showed McGill phones without internet access that he could purchase. (Tr. at 16; Dkt. No. 35 at 170-171.) He also learned about the October 2015 violation of supervised release when Officer Nichols discovered two sexually stimulating videos of minors on McGill's monitored phone resulting in an additional condition being added by Judge Gottschall prohibiting McGill's possession of any sexually stimulating materials. (Tr. at 16-17.)

Officer Williams testified that in his role as supervisor he verified employment, conferred with McGill's sex offender treatment provider, conducted regular, unannounced home visits and monitored McGill's phone through the Computer and Internet Monitoring Program to verify compliance with McGill's conditions of supervised release. (Tr. at 20.) He explained that McGill's treatment provider administered polygraphs and that McGill failed a polygraph test in June 2016 when asked questions about contact with minors and viewing sexually explicit material. (Tr. at 22.) Officer Williams spoke to the treatment provider about the test in hopes the provider would be able to get to the root of the problem but McGill failed a second test approximately 90 days later in September 2016 with regard to the same two questions. (Tr. at 22-23.) Officer Williams confronted McGill multiple times about both tests and McGill routinely denied lying and insisted he had been truthful. (Tr. at 23.) Officer Williams testified

that he believed McGill had lied on the test and that the dishonesty indicated McGill was hiding something and potentially in violation of his conditions of supervised release. (Tr. at 23-24.)

With regard to the February 3, 2017 home visit, Officer Williams's testimony corroborated the government's pre-hearing submission. Officer Williams testified that McGill came to the door, allowed him to enter, they did a walk-through of the first floor and then walked upstairs to McGill's bedroom. (Tr. at 25.) From the doorway of the bedroom, Officer Williams saw the black cellphone he had been monitoring on a nightstand about two feet away from him and, across the room on another stand by the bed, a second, white smartphone in a black case. (Tr. at 25-27.) Officer Williams testified that both phones were LG phones. (Tr. at 49.) He testified that he had never seen the second phone, knew it was not monitored and believed it could have access to the internet. (Tr. at 27.) Officer Williams testified that the unmonitored phone concerned him because he believed it could potentially relate to the failed polygraphs—for example, if McGill had contacted minors via text or picture or had viewed sexually explicit material—and because McGill had previously violated his conditions by viewing sexually explicit material on a cellphone. (Tr.at 28, 32.) Officer Williams testified that the phone concerned him also because he could not help McGill stay compliant with his conditions of supervised release if McGill had unmonitored use of a phone or access to the internet. (Tr. at 28.)

Officer Williams testified that as he stood in the doorway, McGill was in front of him and as he walked through the room, McGill purposefully positioned himself between Officer Williams and the phone. (Tr. at 28-29, 65.) Officer Williams testified that he believed McGill was trying to prevent him from seeing the phone. (Tr. at 29, 65.) He testified that when he asked McGill why he had the phone, McGill immediately picked up the phone, took the case and

back off, took the battery out and told him the phone did not work and that he used it to charge the battery for use in the monitored phone. (Tr. at 29, 37.) Officer Williams testified also that McGill's demeanor "drastically" changed after he asked about the phone and that McGill began speaking very quickly. (Tr. at 29.). Officer Williams testified that he did not believe anyone would keep the cover and back on a phone used only for charging and removing the battery and did not believe McGill would risk a potential violation of his conditions for the sole purpose of having a backup charger. (*Id.* at 30.)

Officer Williams testified that at that point, "given the failed polygraphs, given [McGill's] history with regard to possessing child pornography, given [McGill's] history while on supervision of having an unmonitored phone, and then also having a monitored phone and looking at sexually explicit material," he was concerned there was child pornography on the phone and believed the phone violated McGill's conditions of supervised release. (*Id.* at 30-31.) Officer Williams directed McGill to replace the battery and hand over the phone; McGill complied and immediately became "deflated" and "sad." (*Id.* at 31.) Officer Williams testified that McGill commented that he "would go back to prison for a long time if the judge found out what was on th[e] phone" and stated that "he has difficulty" and "can't control himself with these devices." (*Id.* at 31-32.) When Officer Williams asked if the phone was in any way related to the polygraphs, McGill responded "it may." (*Id.* at 32.) Because of McGill's comments, Officer Williams also asked if there was child pornography on the phone and McGill responded "there is." (*Id.*).

Officer Williams testified that he also became concerned because McGill looked "very distraught" and "very sad" and, therefore, he began to discuss a safety plan with McGill. (Tr. at 33.) Officer Williams explained that he was concerned McGill might hurt himself, so he

directed McGill to call the hospital if anything happened and encouraged McGill to contact his mental health treatment provider. (Tr. at 33, 36.) Officer Williams also told McGill he could call Officer Williams and suggested that McGill contact his attorney to let her know what had taken place. (Tr. at 33.)

Officer Williams testified that he then asked McGill if the phone was password protected because he knew he would likely request a search warrant to determine if there was in fact child pornography or other evidence of a violation on the phone and he preferred not to break into the phone if possible. (*Id.* at 33-34.) McGill said there was no password and Officer Williams turned the phone on to confirm. (*Id.* at 34.) Officer Williams testified that he used the power button to turn the phone on, put it in airplane mode to prevent any information from going into or out of the phone, and then turned the phone off. (*Id.*) Officer Williams testified that when the phone came on, he noticed the wallpaper was an image of a prepubescent boy around five or six years old and this concerned him because based on his knowledge of McGill's conviction and due to his monitoring of him, he knew that McGill was sexually attracted to boys in that age range. (*Id.*)

After leaving, Officer Williams informed his supervisor of the situation including that upon powering up the phone he had seen an image of a young boy's face on the wallpaper. (*Id.* at 37, 56.) Officer Williams wrote this information into his field notes, booked the phone into evidence, and submitted a supervised release violation report to Judge Gottschall. (*Id.* at 37-38.) The report requested a search warrant, a bench warrant for McGill's arrest, and a rule to show cause hearing to show why McGill should be permitted to remain on supervised release and set a calculation for the amount of time for detention. (*Id.* at 39.) Officer Williams also contacted the U.S. Attorney's Office and, shortly thereafter, the FBI obtained a search warrant and took

possession of the phone. (*Id.*at 37-38.) Upon learning that the FBI search identified 4,000 images of child pornography on the phone, Officer Williams submitted a supplemental special report to the judge with this information. (*Id.* at 40.) On cross-examination, Officer Williams admitted that he failed to include in his initial and supplemental violation reports that he had been able to power on the phone or that he had seen the image of a young boy's face on the phone's wallpaper. (*Id.* at 56.) However, he testified that he had informed his supervisor of both of these facts on February 3, 2017 and also had indicated in his field notes completed that same day that he had turned the phone on. (*Id.* at 56, 67, 71.)

Forensic examiner Fabiola Mejia's testimony further corroborated that the cellphone was operable and that the wallpaper depicted an image of a young boy. Mejia works at the FBI Chicago Regional Computer Forensic Laboratory (RCFL) and forensically examines computers, hard drives, laptops, tablets and cellphones. (Tr. at 73-74.) She testified that in the last six years about 50 percent of her cases related to child pornography and estimated that she had examined approximately 50 cellphones. (Tr. at 74.) Mejia testifies that at intake for a cellphone, the RCFL typically asks the case agent whether the phone was put in airplane mode and, if not and the phone is still on, will then put the phone in airplane mode to ensure no data is changed or removed remotely. (Tr. at 75-76.) The evidence technician then enters the powered down phone into the evidence room. (Tr. at 76.) When Mejia is assigned to a case, she checks out the device, places it in the "Ramsey box"—a box that prevents connectivity from the phone to the network—to confirm it is airplane mode, processes the phone and generates a report. (Tr. at 76.)

Mejia testified that in February 2017, she examined the LG cellphone seized from McGill's home.[1]  Mejia was not involved in the intake process for the phone and did not know whether the phone was powered on at intake.  (Tr. at 82.)  However, she testified that when she took the powered off phone out of evidence, she turned it on, placed it in the Ramsey box, confirmed it was in airplane mode and then processed the phone.  (Tr. at 82-83.)  Mejia testified that the phone was not damaged and required no special manipulation; she simply pressed the power button and the phone powered on.  (Tr. at 81-82.)  Mejia also did not use any advanced restoration techniques typically required to examine inoperable phones.  (Tr. at 82-83.)  She recalled that when she turned the phone on, the wallpaper depicted an image of a young boy.  (Tr. at 83.)

Mejia testified that as part of her examination, she extracted the timeline of activity on the phone, the web history, text messages and data related to searched items and downloaded applications.  She testified that applications were downloaded onto the phone in 2017, the last text message was sent on approximately January 1, 2017, and the last date of internet usage was on February 3, 2017.  (Tr. at 85-86.)  Mejia confirmed that based on her analysis the phone was being used up until its seizure on February 3, 2017.  (Tr. at 86.)  On cross-examination, Mejia testified that she could not identify the exact person using the phone at any particular time.  (Tr. at 87.)

McGill relied on his pre-hearing affidavit and submitted no other evidence.  In his affidavit, McGill maintained that Officer Williams failed to turn the phone on after McGill handed it to him and denied saying anything to Officer Williams about his awareness that there was child pornography on the phone.  (Dkt. No. 36-1 at ¶¶ 10, 12.)  By not taking the stand,

---

[1] Specifically, Mejia testified that according to her report she examined LG cellphone model LS740 bearing serial number 410CYSF0573902 with a SIM card bearing the serial number 89011200000503433566.  (Tr. at 80-81.)  These serial numbers match those in the search warrant in this case. (Dkt. No. 52 at Ex. 3.)

McGill declined to subject these assertions to cross-examination. McGill submitted no evidence addressing the prior violation of his conditions, the failed polygraphs, or his demeanor when confronted about the phone.

Finally, the parties stipulated that in the search warrant prepared by Special Agent Goodman after reviewing the probation files, Special Agent Goodman stated that the deception was detected during the June 17, 2016 and September 29, 2016 polygraphs when McGill was asked whether he had sexual contact with a minor. (Tr. at 91.) Special Agent Goodman made no reference to whether any deception was detected regarding viewing child pornography in the search warrant. (*Id.*)

## LEGAL STANDARD

Fourth Amendment claims present two distinct questions: (1) whether a search or seizure actually occurred; and (2) if so, whether the search or seizure was unreasonable. *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010). Generally, "seizures of personal property are unreasonable within the meaning of the Fourth Amendment . . . unless . . . accomplished pursuant to a judicial warrant.'" *United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012) (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). "An officer may temporarily seize property without a warrant, however, if she has 'probable cause to believe that a container holds contraband or evidence of a crime' and 'the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.'" *Burgard*, 675 F.3d at 1032 (quoting *United States v. Place,* 462 U.S. 696 at 701 (1983)).

In *U.S. v. Knights*, the Supreme Court examined the reasonableness of a search for investigative purposes of a probationer by a law enforcement officer. 534 U.S. 112, 115–16 (2001). "[T]he reasonableness of a search is determined 'by assessing, on the one hand, the

degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id*. at 118–19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). The government has a considerable interest in supervising probationers. *See id*. at 120 (("[T]he very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law.") (citations and internal quotations omitted)). Unlike the ordinary criminal, "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence" because they are aware that at a probation revocation hearing, proof beyond a reasonable doubt and the right to a jury trial do not apply. *Id.* (citations omitted). "[T]he balance of these considerations require[d] no more than reasonable suspicion to conduct a search of th[e] probationer's house." *Id.* at 121.

Accordingly, "reasonable suspicion" is the proper standard to apply to the seizure of an item in a probationer's possession. Reasonable suspicion consists of "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Knights*, 534 U.S. at 121 (citation omitted). It is "'something less than probable cause but more than a hunch,' which exists when there is some 'objective manifestation' that a person is, or is about to be, engaged in prohibited activity." *Knox v. Smith*, 342 F.3d 651, 659 (7th Cir. 2003) (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir.2003)). "Ultimately, a court's determination of reasonable suspicion 'must be based on common-sense judgments and inferences about human behavior.'" *United States v. Hagenow*, 423 F.3d 638, 642 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

**<u>DISCUSSION</u>**

McGill argues that, based on the facts known to Officer Williams at the time, Officer Williams unlawfully seized the phone without reasonable suspicion or other legal right to do so. (Dkt. No. 53 at 6.)  The government maintains its position that the seizure was lawful on one or more of the following grounds: (1) the unmonitored cellphone was contraband in plain sight of the Officer Williams, (2) Officer Williams had reasonable suspicion that McGill was using the phone to violate the conditions of release or engage in other criminal activity, (3) the search of the phone and discovery of its contents was inevitable; and (4) Officer Williams acted in good faith in seizing the phone.  Based on the evidence presented at the November 20 hearing, the seizure was lawful on several grounds.

## I.     The Phone was Contraband in Plain Sight

The plain view doctrine allows for seizure of an object if (1) a law-enforcement officer is lawfully present, (2) the item is in the plain view of the officer, and (3) the incriminating nature of the item is immediately apparent.  *United States v. Raney*, 342 F.3d 551, 558–59 (7th Cir. 2003) (citing *United States v. Bruce*, 109 F.3d 323, 328-29 (7th Cir. 1997)).  Here, the first two elements are easily satisfied and the only issue is whether the incriminating nature of the unmonitored cellphone was immediately apparent.  The incriminating nature of the item is "immediately apparent" if the officer has "probable cause to believe that the item is contraband or otherwise linked to criminal activity."  *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004) (citing *Bruce*, 109 F.3d at 328); *see also Raney*, 342 F.3d at 559.  An officer "may have probable cause to seize an ordinarily innocuous object when the context of the investigation cast that item in a suspicious light."  *Id.* at 642.  "A 'practical, nontechnical' probability that

incriminating evidence is involved is all that is required." *United States v. Key*, 162 F. Supp. 3d 674, 678–79 (N.D. Ill. 2016) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

The Court previously ruled, based on the plain language of the terms of supervised release, that the unmonitored cellphone was not in and of itself a violation of McGill's conditions of supervised release. (*See* Dkt. No. at 8.) The relevant Computer and Internet Monitoring condition required that McGill "consent to the installation of computer monitoring software on all *identified* computers to which defendant has access," and not all computers generally. *See* 09 CR 70, Dkt. No. 178 (emphasis added). There is no dispute that McGill had not identified the cellphone for monitoring; therefore, the mere presence of the phone was not contraband under the conditions of his release. The government argues persuasively that interpreting the condition this way renders it meaningless and allows McGill to circumvent the monitoring requirements by possessing an unidentified phone. (Dkt. No. 52 at 16.) But the Court need not address this practical problem because by applying the totality of the circumstances, the Court reaches the same conclusion.

Officer Williams testified that he believed possessing an unmonitored phone capable of accessing the internet violated the condition. (Tr. at 30-31, 60-61.) But the plain language of the condition does not prohibit an unmonitored phone; it merely subjects that phone to future monitoring once identified, so this Court must look to the totality of the circumstances to determine whether Officer Williams reasonably believed the phone was linked to a violation of McGill's conditions. (*See* Dkt. No. 47 at 9.)

McGill's conditions prohibited him from having contact with minors and from possessing any sexually stimulating materials including on a cellphone. McGill failed two polygraph tests specifically in regard to his compliance with these two conditions. As of February 3, 2017,

Officer Williams had not determined how or when McGill might have had contact with minors or viewed sexually stimulating materials. Officer Williams knew, however, that McGill had previously violated his conditions by viewing child pornography on a cellphone. Officer Williams testified that when he observed the unmonitored cellphone he noticed that it was a smartphone, believed it to be capable of connecting to the internet and believed it might relate to the failed polygraphs. Officer Williams' testimony sufficiently linked the unmonitored phone to the suspected violations: he confirmed that he suspected McGill had violated certain conditions of his supervised release and that he knew McGill could violate—and indeed had violated— these conditions using a cellphone. *See, e.g.*, *Key*, 162 F.Supp.3d at 680 (officer's testimony at suppression hearing allowed for reasonable inferences necessary to link the item seized to illegal activity).

McGill argues that Officer Williams did not know by looking at the phone if it in fact was capable of connecting to the internet or even capable of being turned on. As an initial matter, the phone need not connect to the internet to contact minors or to contain images of child pornography; McGill could have contacted minors or received such images via text or at a time in the past when the phone did have internet connectivity capabilities. Furthermore, McGill's suspicious attempt to block Officer Williams' view of the phone, his drastic change in demeanor when asked about the phone (demeanor which Officer Williams has had an opportunity to view on numerous occasions in the past), and the nonsensical excuse he offered for having the phone reinforced Officer Williams' suspicion that the phone worked, contained incriminating evidence, and was used for more than charging spare batteries.

Based on the totality of the circumstances, it was reasonable for Officer Williams to believe that the unmonitored cellphone was contraband linked to a violation of the conditions of his supervised release.

## II.     The Seizure of the Phone was Reasonable

As stated above, given McGill's status, the government need only show that when Officer Williams seized the phone he had a reasonable suspicion that McGill was in violation of his conditions of supervised release and that the cellphone was evidence of that violation or other criminal act.  Largely for reasons already discussed, the government also meets this standard.

At the time he seized the phone, Officer Williams reasonably believed based on the failed polygraphs that McGill had contacted minors and/or viewed sexually stimulating materials in violation of his conditions but did not know how McGill had done so given that his monitored cellphone did not have contraband on it.  Officer Williams then observed McGill suspiciously attempt to block his view of this unmonitored phone, claim it did not work, and offer an unconvincing reason for having the unmonitored phone.  *See, e.g., Wardlow*, 528 U.S. at 124 (recognizing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion").

McGill disputes that he acted nervously or attempted to block Officer Williams' view of the phone.  The Court gives little weight to these claims, however, as McGill declined to subject them to cross-examination or provide the Court an opportunity to assess his credibility at the hearing.  *See, e.g.*, *United States v. Conrad*, 578 F. Supp. 2d 1016, 1021 (N.D. Ill. 2008), *aff'd*, 673 F.3d 728 (7th Cir. 2012) (affording defendant's affidavit "substantially less weight" than the credible testimony provided by law enforcement officers at suppression hearing).  In fact,

McGill's claims about key facts were repeatedly proved untrue at the hearing. Most notably, the phone *did* work and *did* contain images of child pornography.

Additionally, the fact that McGill offered an explanation for having the phone or that he told Officer Williams the phone did not work did not negate reasonable suspicion for the seizure. *See Mahnke v. Garrigan*, 428 F. App'x 630, 634 (7th Cir. 2011) (defendant's explanation "did not . . . negate probable cause"). Officer Williams "had to account for [McGill's] explanation . . . but he need not have credited it." *Id.* (citing *Askew v. City of Chicago*, 440 F.3d 894, 895–96 (7th Cir. 2006)). Officer Williams as an experienced probation officer with years of training in the area of monitoring sex offenders on supervised release credibly testified that he found McGill's behavior suspicious and did not believe what McGill told him. Officer Williams also had a significant stretch of time monitoring McGill specifically and so he would know what his typical or ordinary behavior was and more importantly, how his behavior was different from other visits or meetings.

The government relies on two cases to demonstrate Officer Williams had reasonable suspicion to seize and search McGill's phone. The Court previously found that based solely on the parties' pre-hearing submissions, these cases were distinguishable because of certain disputed facts. Now, however, the Court has the benefit of factual findings and the additional evidence and testimony presented at the hearing, and with that new information, the two cases are instructive in determining the reasonableness of the seizure.

In *United States v. Yuknavich*, the Eleventh Circuit upheld the seizure and subsequent search of a computer from the defendant-probationer's home. 419 F.3d 1302 (11th Cir. 2005). In determining that the officers had reasonable suspicion to suspect the defendant's use of the computer violated his probation, the Eleventh Circuit considered everything the officers knew

beforehand including that the defendant had violated his conditions twice and on several other occasions come close to violating them, the officers observed a phone line running into a modem connected to the defendant's computer, and the defendant delayed in answering the door for the officers and acted nervously during the home visit. *Id.* at 1311. Similarly, Officer Williams knew not only that McGill had previously violated his conditions but also that he had likely violated them again, Officer Williams identified a device he believed McGill could use to violate his conditions, and McGill acted suspiciously with regard to that device during the home visit. More significantly, when Officer Williams asked McGill about the phone, McGill made three incriminating statements reflecting his awareness of the contraband and the violation.

Similarly, in *United States v. Makeeff*, the Eighth Circuit upheld the seizure of a USB drive from the defendant-probationer's home. 820 F.3d 995 (8th Cir. 2016). The court held that the probation officers had reasonable suspicion that the USB contained evidence that the defendant possessed and had viewed child pornography in violation of the conditions of his release because a USB can be used to conceal prohibited images, the defendant had a prior child-pornography conviction and a prior violation for viewing child pornography, and the officers received a tip that the defendant was again viewing child pornography. *Id.* at 1001-02. Likewise, the failed polygraph tests provided Officer Williams independent information that McGill may have violated his conditions such that when he observed the unmonitored phone, he had reasonable suspicion to believe it was evidence of a potential violation.

## III.    Search by Warrant was Inevitable

Under the doctrine of inevitable discovery, "illegally seized evidence need not be suppressed if the government can prove by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means." *United States v. Pelletier*, 700 F.3d

1109, 1116 (7th Cir. 2012) (citing *Nix v. Williams*, 467 U.S. 431, 442–44 (1984)). The government must show, first, "that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence," and second, "that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637-38 (7th Cir. 2009). To satisfy the second prong, the government need only show that "[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant." *Id*. at 640.

The evidence presented at the hearing established that McGill admitted to Officer Williams that the phone contained images of child pornography. McGill maintains that he did not mention child pornography but he relies only on his affidavit which the Court affords little weight. Officer Williams testified that after McGill handed him the phone, he became deflated and sad, saying he would go back to prison because of what was on the phone and that he could not control himself with such devices. Then, when Officer Williams explicitly asked if there was child pornography on the phone, McGill said there was and became "very distraught." Officer Williams testified that McGill's demeanor changed so much that he became worried about his safety and concerned he might hurt himself. This is testimony from an officer who had an understanding of how McGill behaved on his previous visits and during his previous interactions.

Evidence presented at the hearing also established that the phone was operable and Officer Williams powered it on during the home visit. Officer Williams testified that he powered the phone on in order to change the setting to airplane mode and, when he did so, viewed the image of a young boy's face as the wallpaper. Mejia confirmed that RCFL advises officers to put a seized phone in airplane mode to prevent data from being changed or removed remotely and that she was able to power on the phone without difficulty and also observed that the

wallpaper image was the face of a young boy. Thus, McGill's assertion in his affidavit that the phone did not work is not credible.

With the confession and Officer Williams' observations, the government had sufficient justification for seeking a warrant to search the phone. McGill contends that the government's past conduct indicates it would not necessarily seek a warrant, as his previous probation officer failed to do after discovering he had an unmonitored phone. But the government's evidence goes beyond the mere possession of an unmonitored phone. It would be unreasonable to conclude that having also discovered that the phone powered on, observed the wallpaper image and heard McGill's confession that the government would have failed to seek a warrant. In fact, Officer Williams testified that, based on this information, he filed a violation report and requested a search warrant, bench warrant and detention hearing from the judge in McGill's underlying case—all of which is accurate.

Finally, it would be unreasonable to believe that having identified an unmonitored cellphone in the first instance, Officer Williams would not have conducted an initial inspection of the unmonitored phone to determine whether it was operable and should be placed on monitoring according to the Computer and Internet Monitoring condition of McGill's supervised release. According to the testimony of Mejia, a forensic examiner with years of experience and training in examining cellphones in child pornography cases at the RCFL, any routine inspection of the phone by an RCFL examiner would have revealed not only that the phone was operable but also that it had been used up until February 3, 2017 and that the wallpaper depicted an image of a young boy's face. And once the operating phone was placed on monitoring, Officer Williams would have found the thousands of images of child pornography. Thus, the discovery

of evidence was inevitable even before McGill confessed or Officer Williams powered on the phone.

## IV.     The Probation Officer Acted in Good Faith

Finally, even if the seizure had been unlawful, the Court finds that Officer Williams acted in objective good faith in seizing the cellphone.  A violation of the Fourth Amendment "does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 555 U.S. 135, 140 (2009) (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).  "Indeed, exclusion 'has always been our last resort, not our first impulse.'"  *Id.* at 140 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).  For the exclusionary rule to apply, "[t]he benefits of deterrence must outweigh the costs."  *Id.* at 141 (citing *United States v. Leon*, 468 U.S. 897, 909 (1984)).  When law enforcement acts "with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force" and the exclusionary rule does not apply.  *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotations omitted).

Officer Williams testified that he believed, albeit incorrectly although a reasonable person could interpret the clause as he did, that the unmonitored phone violated the Computer and Internet Monitoring condition of McGill's supervised release.  He testified also that the unmonitored phone concerned him because any unmonitored access to minors or to the internet made it more difficult for him to help McGill stay in compliance with his conditions.  Officer Williams testified that when he seized the phone he planned to obtain a search warrant and asked whether the phone was password protected specifically for that purpose.  Officer Williams filed a report with the judge in McGill's underlying case and requested a search warrant, bench warrant, and detention hearing to determine whether McGill had in fact violated his conditions.  Officer Williams' credible testimony confirms that he seized the phone out of concern that McGill had

violated the conditions of his supervised release and that he in good faith believed he acted lawfully in doing so.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant McGill's Motion to Suppress [23] is denied.


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 20, 2018